

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# ALEXANDRIA DIVISION

| | |
|---|---|
| CHARLES E. GUILLORY, et al. | CIVIL ACTION NO. 1:10-cv-1724 |
| -vs- | JUDGE DRELL |
| AVOYELLES PARISH SCHOOL BOARD, et al. | MAGISTRATE JUDGE KIRK |

## RULING AND ORDER

Before the Court are two interrelated but ultimately distinct claims under the Voting Rights Act of 1965. 42 U.S.C. § 1973.

For one, Mr. Guillory, et al. ("Plaintiffs") have filed a claim under Section 2 of the Voting Rights Act and various provisions of the United States Constitution alleging disenfranchisement of minority voters in Avoyelles Parish, LA ("the Parish") in the last school board election. This claim follows an earlier Voting Rights action before this court which resulted in a settlement and consent decree in 2006.[1] Under that settlement, the nine-member Avoyelles Parish School Board ("the Board") agreed that at least three of its members would be elected from majority-minority districts. Recently, one of these three members was removed from her seat, apparently caused by a mistake by the Parish's Registrar of Voters ("the Registrar"). Consequently, only two members elected from majority-minority districts remain on the Board. Plaintiffs allege this arrangement violates both the Voting Rights Act, and this Court's earlier consent decree.

For two, Plaintiffs make an individual claim under the Voting Rights Act on behalf of the removed School Board member, Mrs. Lizzie Ned ("Mrs. Ned"). They allege that the Registrar and

---

[1] Docket. No. 1:03-285, docs. 41, 42.

other Parish officials misled her, causing her to run for and win a position on the School Board representing a district in which she did not reside, which defect led to her recent removal. They claim that because her ineligibility resulted from "state action,"[2] she should not have been removed from her School Board seat. They ask us to reappoint her to her seat, to move the line for the voting district so that her residence is encompassed within it, and / or for other equitable relief. (Doc. 1).

For the reasons given below, we rule FOR Plaintiffs that the effect of the Registrar's error was to disenfranchise the voters of District 6 specifically and the minority voters of Avoyelles Parish more generally. However, we DENY Plaintiffs' claim that reappointing Mrs. Ned to the Board is the appropriate remedy. Instead, we rule that a special election should be held as soon as practicable to fill the seat with a representative elected by the disenfranchised community.

Regarding the composition of the district for the new election, we find that we likely have the authority to order a redrawing of the district voting lines. However, we cannot presently determine whether such a step is necessary or feasible. Accordingly, we ORDER a hearing on this issue for 1:30 PM on Monday, February 28. Finally, if the line is not moved, we ORDER that Mrs. Ned be permitted, for this election only and should she so choose, to move into the District, and any length of residency requirements to her candidacy and eligibility to hold office be waived, so long as she actually resides in the District on the date she is to take office.

## PROCEDURAL BACKGROUND

The Avoyelles Parish School Board is a party to a still active school desegregation suit, and

---

[2] Avoyelles Parish is a political subdivision of the State of Louisiana, and actions by its officials qualify as "state action" if all of the other requirements are met.

it operates under various orders arising therefrom.[3] Although the violations alleged here have been determined to arise under the Voting Rights Act and not any of the desegregation orders, the result here has obvious implications for that suit. So, Allen Holmes, a permissive intervener in the desegregation suit, has actively and continually participated in the present action.

Avoyelles Parish is also a "covered jurisdiction" under section 5 of the Voting Rights Act. Consequently, any voter reapportionment plan proposed by the Parish must comply with various federally imposed requirements, including receiving "preclearance" from the United States Department of Justice.

Finally, the Board was recently a party to another suit under the Voting Rights Act filed by these same Plaintiffs.[4] In 2006, that case was settled in a court-approved consent decree, memorialized in both a formal Judgment of this Court and an Order directing that the Judgment be "implemented immediately." (Id, docs. 41, 42). This decree dictated the configuration of the present voting districts, and ultimately resulted in Mrs. Ned being moved, without her apparent knowledge, into a new voting district.

The present action was filed in November 2010, originally in the above mentioned Voting Rights Act suit. Due to the difference in time and what initially appeared to be distinct underlying factual and legal issues, we required Plaintiffs to file their complaint as a separate action. Nonetheless, the Judgment and Order from the previous suit remain valid and binding on the parties here.

Plaintiffs initially sought an injunction to prevent the removal of Mrs. Ned from her School

---

[3] Docket No. 65-12721.

[4] Docket No. 1:03-285

Board seat after several residents of District 6 filed a complaint alleging that she did not reside in the district she was elected to represent, as required by state law. We initially issued an order to show cause on this point. (Doc. 4). Upon learning that Mrs. Ned's contest to her removal was still pending in state court, we delayed ruling on the issue because of lack of ripeness (Doc. 6).

The issue became ripe after the state court ruled Mrs. Ned was ineligible to run in the last election or hold her current seat, that her seat was therefore vacant, and that the vacancy should be "filled as provided by law." (Doc. 7-1, p. 6).[5] Plaintiffs then renewed their requests here, seeking an injunction to prevent the execution of the state court judgment and other equitable relief.

On December 27, 2010 we held a hearing in which the main parties, the intervenor, and the United States Department of Justice participated, and at which we took notice of the state court's ruling. We subsequently held a telephone conference among the same parties (Doc. 9) and requested additional post-hearing briefing on specific issues. (Doc. 10). We have thus received extensive argument on all issues from all parties, all of which we have reviewed in detail in rendering our decision here.

ANALYSIS

## I. THE AVOYELLES PARISH SCHOOL BOARD IS OUT OF COMPLIANCE WITH OUR CONSENT JUDGMENT, AND WILL BE UNTIL A NEW ELECTION IS HELD

### A. Legal standard

The Voting Rights Act protects the right to vote guaranteed by the Fifteenth Amendment of the United States Constitution. Section 2 of the Voting Rights Act states simply that:

(a) No voting qualification or prerequisite to voting or standard, practice, or

---

[5] The time for appeal of that judgment has lapsed. We thus consider it final and binding here as the law of the case regarding the state election law issues it addressed.

4

procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color. . . .

42 U.S.C. § 1973(a) (emphasis added).

In a judicial proceeding by one whose right to vote has been impaired under Section 2, a plaintiff need not show that a practice or procedure was intended to be discriminatory or adopted to serve a discriminatory purpose; rather, discrimination can be shown through "effects" alone. *Id.*; see *Jordan v. Winter*, 604 F.Supp. 807 (N.D. Miss. 1984), aff'd, 469 U.S. 1002 (1984). This general prohibition on voting practices with a discriminatory effect is the grounds for the present action, and for the Court's earlier Consent Judgment.

The Attorney General or any "aggrieved person" may institute a civil proceeding for deprivation of voting rights under the above provision. See *Salas v. Southwest Texas Jr. College Dist.*, 964 F.2d 1542, 1544 (5th Cir. 1992). An unsuccessful candidate generally lacks standing to sue under the Voting Rights Act by virtue of her status as a candidate. See *Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989) ("Although the 'aggrieved person' language [of the Act] might be stretched to include an unsuccessful candidate . . . we are unconvinced that Congress intended it to be stretched that far. The purpose of the Voting Rights Act is to protect minority voters, not to give unsuccessful candidates for state or local office a federal forum in which to challenge elections."). Put simply, the primary concern of the Voting Rights Act, the Fifteenth Amendment, and federal law more generally is to protect the rights of voters, not candidates.

Nonetheless, while federal law may not protect the right of any single candidate to run for and / or hold office, a long line of cases recognizes that voters may be disenfranchised through the consistent manipulation of the candidate selection and certification process. See e.g., *Smith v.*

5

*Allwright*, 321 U.S. 649, 657 (1944) (extending the protections of the Fifteenth and other Civil Rights Amendments to private political party primary elections, in which African-Americans were not allowed to participate); see generally *Powell v. McCormack*, 395 U.S. 486, 527-30 (1969) (discussing the English King's manipulation of candidates' eligibility in the "long and bitter struggle for the right of the British electorate to be represented by men of their own choice."). However, the focus of these cases generally and the Voting Rights Act specifically were and are not "garden variety election irregularities," even those which result in genuine injustice in any particular election. *White-Battle v. Democratic Party of Virginia*, 323 F.Supp.2d 696, 705 (E.D.Va. 2004); see *Duncan v. Poythress*, 657 F.2d 691, 702 (5th Cir. 1981). Rather, the issue is whether the people's right to participate equally in the political process, and ultimately minority voters' right to elect the representative of their choice, was abridged. 42. U.S.C. § 1973(b). Accordingly, an unsuccessful candidate's claim must be causally connected to these wider factors of disenfranchisement for the Voting Rights Act to be violated. See *Giles v. Ashcroft*, 193 F.Supp.2d 258, 263 (D.D.C. 2002).

"A consent decree is a judicial act and possesses the same force and character as a judgment rendered following a contested trial." *U.S. v. Homestake Min. Co.*, 595 F.2d 421, 425 (8th Cir. 1979) (internal quotations and citations omitted). The entry of a consent decree does not terminate a district court's jurisdiction. Instead consent judgments are subject to continuing supervision and enforcement by the court, and the court stands behind the decree, ready to interpret and enforce its provisions. This retention of authority is part of a court's inherent powers and exists regardless of whether a particular consent decree expressly so provides. See *In re Pearson*, 990 F.2d 653, 658-59 (1st Cir. 1993); see generally 46 Am. Jur. 2d Judgments § 200 (discussing a court's authority to supervise and enforce a consent decree).

6

**B. Relevant facts**

Mrs. Lizzie Ned ran for and won re-election to the Avoyelles Parish School Board in 2010. She was elected to represent District 6, one of three (3) majority-minority districts in the Parish. Days before the election - and after the end of the 30 day pre-election candidate qualification period - the new Registrar of Voters realized that Mrs. Ned resided not in District 6 but in District 4.[6]

It is undisputed that Mrs. Ned had been incorrectly informed of her district of residence by the former Registrar through her voter registration card. Specifically, the prior Registrar apparently failed to realize that the town of Bunkie's street numbering system did not align with the ordinary "911 numbering" system in use by the rest of the Parish for a number of years. This was generally without consequence except where, as here, a district line bisected a street; then, the Registrar's database of addresses - of which house was on which side of the street - would not match the actual division. The line between District 4 and District 6 bisected Mrs. Ned's street. Mrs. Ned's house was on the District 4 side, but the prior Registrar, because of the error in her numbering database, incorrectly listed Mrs. Ned's residence as lying on the District 6 side. Accordingly, the Registrar incorrectly informed Mrs. Ned on her voter registration card as to her proper voting district and that this permitted her to run for a seat in a district in which she did not reside.

The Parish held the School Board election despite the error. Post-election, two individuals filed complaints based on Mrs. Ned's lack of residency in the District.[7] Thereafter, and in accordance with state law, Mrs. Ned's seat was declared vacant. (Copy of state court decision, Doc.

---

[6] Mrs. Ned's residence was also in District 4 during her first election and term as the board member for District 6, but the error then went unnoticed.

[7] One of the complaints has since been withdrawn. Both complainants testified at this Court's hearing.

7-1). An interim replacement to fill the seat was chosen by the existing School Board on January 4, 2010.

Finally, in their complaint Plaintiffs allege various intentional and nefarious schemes by Parish officials, of which the Registrar's error is allegedly a part. We allowed them extensive opportunity to explore this topic, including by directly questioning various alleged co-conspirators at the hearing. No evidence of any scheme or nefarious action was uncovered or presented. We thus consider Plaintiffs' allegations in this regard to have been without evidence or support, and ultimately without merit.[8] Instead, the error resulting in Mrs. Ned's removal seems to have been nothing more - or less - than a serious but ordinary mistake.

### C. Application - the Board is out of compliance with our previous Judgment and Order, and it will be until a new election is held

The present claim arises because the seat Mrs. Ned was elected to fill was one of three majority-minority seats on the nine person School Board. The existence of these three majority-minority seats was ordered by this Court pursuant to a consent decree resolving a prior Voting Rights Act suit between these same parties. (Docket No. 1:03-285, docs. 41, 42). Therefore, the Registrar's error, even if unintentional, had the effect of disenfranchising the voters of one of these three majority-minority districts. This is allegedly a Voting Rights Act violation in its own right. It is also allegedly a violation of this Court's consent Judgment and Order.

Whether this situation would constitute a Voting Rights Act violation in its own right is a question we need not answer, for the School Board's present non-compliance with the Court's Judgment and Order is clear. The School Board is obligated to have three members elected by

---

[8] A motion for sanctions against Plaintiff's attorney for making these allegations is currently pending before the Court and will be dealt with separately.

majority-minority districts.  Presently it only has two.  Until the voters of District 6 elect a new representative of their choosing, these voters specifically and the minority citizens of Avoyelles Parish more generally are disenfranchised, and the School Board is in breach of its obligations under our Order.

Arguing to the contrary, the Board points out that the new board member appointed to fill Mrs. Ned's seat is from District 6 and African-American, and that the Board's other two African-American members approved of her selection.  This is an important political gesture and sign of the Board's good faith.  However, it is without legal import, as it misunderstands the purpose of the Voting Rights Act and the rights at issue here.

Specifically, our Order was designed to protect the right of minority voters "to participate effectively in the political process and to elect representatives of their choice."  *Thornburg v. Gingles*, 478 U.S. 30, 39 (1986).  The particular outcome of this participation is not our issue.[9]  That another procedure may produce the same number of African-American Board members is irrelevant if these individuals were not elected by the voters of the Parish and the voters' rights to political participation and representation have been abridged.

Thus, until these issues are resolved - until the voters of District 6 are allowed to participate in the political process and elect a representative of their choosing - the School Board remains out of compliance with our consent Judgment and Order.  Accordingly, we find that a new election to fill the seat must be held to bring the Board back in to compliance.

---

[9]  The Board's racial make-up at any one time can be evidence of the (in)effectiveness of its participation and representation procedures.  However, federal law is ultimately blind to the race of voters' chosen representatives.

## II. WHETHER THE DISTRICT LINE SHOULD OR CAN BE REDRAWN FOR THE ELECTION IS UNCLEAR

### A. We cannot determine if a new election in District 6 would be non-discriminatory

Plaintiffs presented evidence of voter disenfranchisement in the previous election due to the town's irregular address numbering system.  Most obviously, Mrs. Ned herself, as a voter, did not have the opportunity to vote in the district in which she lived.  Plaintiffs also presented the testimony of another voter who had been misinformed about her district of residence by her voter registration card and was apparently turned away by poll workers when she went to vote.

The School Board claims that the Registrar has now corrected its database.  Presumably, any new election in the present District 6 would therefore not be beset by these issues.[10]  However, we have received no specific evidence on this pont, either that the registrar's database is now correct or that other steps to ensure a non-discriminatory election - such as the mailing of new, correct Voter Registration cards - have been taken.  Accordingly, we consider this question an open issue.

### B. If not, moving the District 6 line promptly is within the power of the Court

Plaintiffs request that we redraw the district lines to include Mrs. Ned's house in District 6.  As indicated, the Voting Rights Act is concerned with voters, not candidates.  So, it provides no justification for this measure to protect her place on the Board.

On the other hand, if the (lack of a) 911 numbering system is presently disenfranchising minority voters and can only be remedied by moving the District line so that the everyone comes to reside in the District they think and have been told they do, then such a measure could be warranted.

---

[10]  Here we only address fixing these irregularities prospectively.  Retrospectively, these irregularities do not appear to have affected the integrity or outcome of the election in District 4, and a new election for District 6 is already ordered.

If so, then it is highly likely that we can correct this Constitutional violation without seeking Section 5 preclearance. See *Abrams v. Johnson*, 521 U.S. 74, 75 (1997) ("[A] court-devised redistricting plan . . . need not be precleared under § 5 [of the Voting Rights Act]"); see also *McDaniel v. Sanchez*, 452 U.S. 130, 148-49 (1981) (clarifying that, for this exception to the ordinary preclearance requirement to apply, the court must "actually fashion[] the plan itself instead of relying on a plan presented by a litigant.").

### C. A hearing is needed and ordered on this issue

The issues with this solution are, first, as discussed above, it is not clear it is necessary, and second, whether an alternative line between Districts 4 and 6 can be drawn that would remedy the issue. Even if Section 5 preclearance is not required, a court must nonetheless determine the place of any new district lines according to Section 5 standards. *Abrams*, 521 U.S. at 75. The School Board's expert has conducted a preliminary report that casts doubt on whether this is feasible. (Doc. 11-1). However, the report is only preliminary, and it is contested by Plaintiffs.

Accordingly, we find that a hearing is needed on these issues, specifically to determine:

- whether this solution is necessary, or whether the Registrar has already updated her records so that a new election would not result in disenfranchisement; and

- whether a new district line can be drawn that would remedy the problem.

We schedule this hearing for February 28, 2011 at 1:30 PM.

### III. OTHERWISE, PREPARATIONS FOR THE NEW ELECTION SHOULD COMMENCE IMMEDIATELY

### A. The new election should be held as soon as practicable

As noted, the School Board is presently out of compliance with our Consent Judgment, and

11

the voters of District 6 remain disenfranchised.  Accordingly, the new election should be held as soon as practicable, notwithstanding any delay to determine if a redrawing of the district line is necessary.

More specifically, Parish representatives have previously mentioned the possibility of holding an election in the late fall, in October or November when apparently police jury elections are also to be held.  We are not insensitive to the financial constraints that make this date attractive. However, we find such a long delay would be inappropriate for two reasons.

First, it would leave the town out of compliance and the voters of District 6 disenfranchised for almost an entire year during which major School Board policy decisions will be discussed and made, including some likely relating to the Parish's desegregation suit.  This factor makes a quick return to compliance and enfranchisement of minority voters highly desirable.

Second, reapportionment of the state's political subdivisions will occur over the coming months.  As we understand it, the census data will likely be released this summer and new districts drawn in time for the fall elections.   It is obviously important in itself that no voters be disenfranchised and prevented from participating in this process. More importantly, the new districts may not correspond to the existing districts, so that an election from the "new" District 6 would violate basic principles of proportional representation and "one-person one-vote."  See *Reynolds v. Sims*, 377 U.S. 533, 557-59 (1964) ("The idea that every voter is equal to every other voter in his State . . . underlies many of our decisions. . . . The conception of political equality from the Declaration of Independence . . . can only mean one thing–one person, one vote.") (internal citations and quotation omitted).  Otherwise, if there is little or no correspondence between the old and new District 6, we might have to order new elections for multiple Board seats or perhaps even the entire

12

Board, a presently unnecessary step we would strongly prefer to avoid.

In all, it is unacceptable for the minority voters of Avoyelles to be deprived of a representative of their choice while important policy decisions, including regarding school desegregation, are made, and it would be a violation of basic democratic principles to have a new School Board member elected according to different district lines than the rest of the School Board. Accordingly, while we of course leave the exact date of the new election to the discretion of local officials, we order that it be sooner than the fall dates previously discussed, and preferably by the middle of the spring or early summer at the latest.[11]

### B. The Parish's schoolchildren should not pay for their officials' mistakes

Finally, we agree with the Board that its present non-compliance and the voters' recent disenfranchisement was and is almost entirely the fault of the Parish's Registrar of Voters. We would therefore find it highly inequitable were the funds for the new election to come from general school operating funds. Accordingly, though we make no order on this point at this time, we pray that the relevant Parish and / or state officials are able to find an equitable method for funding this election so that the schoolchildren of the Parish do not pay for their officials' mistake.[12]

## IV. PLAINTIFF'S PRAYER FOR INDIVIDUAL RELIEF FOR MRS. NED

### A. There is no justification for re-appointing Mrs. Ned to her seat

---

[11] We understand that one of the parties earlier contacted the Louisiana Secretary of State and was informed that an election could possible be held in April. We do not know if this information was or remains accurate. However, we would find this or a similar date highly amenable.

[12] The Board discusses this issue as one of standing. Given its clear and ongoing non-compliance with our Order, we disagree that (lack of) standing is an issue. On the other hand, that another party ultimately caused the Board's non-compliance could raise the prospect of contribution and / or the right to bring a third party action. As no such action has been filed, we decline to opine on whether such an action, filed here or in another court, would be legitimate.

As discussed above, the Voting Rights Act protects the right of voters, not candidates, and unsuccessful candidates, as candidates, generally do not have standing to challenge local election outcomes under the Act. See *White-Battle*, 323 F.Supp.2d at 702. Mrs. Ned's case is distinguishable from typical unsuccessful candidate cases, however, in that she won her election. Therefore, she can legitimately claim to be the chosen representative of the majority-minority district, and her claim is at least causally connected to protecting the voters' right to be represented by an individual of their choosing under the Voting Rights Act. See *Giles*, 193 F.Supp.2d at 263-64.

On the other hand, as discussed by the state court, state law requires that candidates and representatives reside in the district they are elected to represent, so Mrs. Ned cannot continue to hold her seat. (Doc. 7-1). While federal courts have the power to set aside state election practices that conflict with federal law or are otherwise discriminatory, there is no indication that Louisiana's requirement is discriminatory, either on its face or as generally applied. Meanwhile, while it had a discriminatory effect in this instance, the injury to the voters of District 6 may be remedied through a new election, as discussed above, without setting aside this principle. Therefore, we find no need to override the state court's ruling and / or state law by re-appointing Mrs. Ned to the District 6 seat.

**B. Mrs. Ned is entitled to run in the special election**

Nonetheless, we are not insensitive to the injustice Mrs. Ned suffered.

First, she has been denied her right to stand as a candidate, and she is almost entirely blameless in this deprivation. Mrs. Ned may have been able to learn her true district of residence had she gone to the Registrar's office and consulted the maps there in detail. However, she was the incumbent, had lived in the District for years, and the card she received from the Registrar

14

specifically informed her that she remained in the District. So, not only did she have no reason to verify her residency, she was deliberately misled into not doing so.

Meanwhile, the election for Mrs. Ned's actual district of residence, District 4, has passed. And, though we make no specific findings regarding ordinary residency requirements under Louisiana election law, we note that it is unlikely, even were she to move to District 6 today, that she could meet the length of residency requirements to run in the new election to be held there. So, though she acted in good faith and made a reasonable, bona fide effort to qualify in the district where she lived, she is to be entirely denied her right to stand as a candidate due to the Registrar's error.

Second, we note that the voters of District 6 chose Mrs. Ned to be their representative. We have attributed the error resulting in her removal from office to simple negligence and find that a new election is a sufficient remedy to protect these voters' rights. However, it remains the case that those voters chose Mrs. Ned overwhelmingly when offered the choice. Therefore, while we make no specific findings on this point, we recognize that our viewpoint is limited and that there may be a reason why the voters should be entitled to choose her in particular as their representative.

Finally, Mrs. Ned was only deprived of her seat due to the special circumstances resulting from our previous intervention in the state electoral process. She had lived in District 6 previously, including under the original allegedly discriminatory plan approved by the School Board. She was only moved out of the District when the districts lines were redrawn, outside of the usual reapportionment period, under our 2006 Order. So, it was ultimately our intervention that resulted in the uncertainty and confusion that misled Mrs. Ned.

In all, she - and the electorate which was not afforded her as a choice - was an innocent victim of these circumstances and the state's error, and if she is unable to run for the School Board

15

at all as a result, a substantial injustice will result.  Accordingly, we find that Mrs. Ned, if she should

so choose, should be allowed to move to District 6 to stand as a candidate in the special election to

be held there, and that any ordinary length of residency restrictions on her eligibility resulting from

such a late move into the district should be waived.  Specifically, we order that so long as she is

otherwise eligible, has taken bona fide steps to change her residency by the election qualification

date, and does reside in the District by the time she takes office, she shall be allowed to run in the

election, and if elected, take her seat and serve.

We recognize that this order may represent a departure from ordinary Louisiana election

law.[13]  Were there a conflict, it could be that we would have the power to set this law aside under our

inherent power to enforce compliance with our Consent Judgment, and / or under the Voting Rights

Act.  However, we find that there is no conflict, and that Louisiana law specifically allows for such

dispensations.

In particular, we find the present case similar to that of *McCarter v. Broom*, where a

Louisiana court ruled Broom, an incumbent member of the St. Tammany Parish Council, eligible

to run in a new district despite his having lived in his new district for less than the period required

to qualify, following the Parish's court-ordered reapportionment.  377 So.2d 383 (La.App. 1 Cir.

1971).  The *Broom* court allowed Broom to "qualify as a candidate in [his new district] . . . subject

to the requirement that he be legally domiciled in and a resident of [his] district on the date he is

sworn into office."  *Id.*, at 384.  As reasons, the court noted that: (i) Broom made a "bona fide effort"

to comply with the domicile laws; (ii) "the uncertainties resulting from the redistricting court order,

---

[13]  We reiterate that we make no finding as to what are the ordinary residency requirements for Avoyelles
Parish School Board candidates.

16

[and] . . . the special circumstances resulting from Federal intervention in the State electoral process," were ultimately responsible for his confusion and failure to comply with the residency requirements; and (iii) "a substantial injustice will result if Mr. Broom is denied the opportunity to run." *Id.,* at 384. More generally, and with special applicability in a Voting Rights context, it observed that, under Louisiana law, "[c]andidacy is favored in order to afford the electorate a choice," and that "'[t]he basic policy of our form of government requires that laws governing the conduct of elections be liberally interpreted to promote rather than defeat candidacy.'" *Id.* (quoting *Rich v. Martin,* 259 So.2d 113 [La.App. 1 Cir. 1971]). We find the same factors discussed in *Broom* to be applicable here, and therefore that no conflict exists between our ruling and Louisiana election law.

## CONCLUSION

For the reasons given above, we ORDER that a special election be held as soon as practicable to allow the voters of District 6 to elect a representative of their choosing. Though it was apparently neither its fault nor intent, the School Board is out of compliance with our Consent Judgment and Order, and the voters of District 6 have been disenfranchised. While we leave the exact date for the special election to the discretion of local officials, these results of the Registrar's error must be remedied as soon as practicable, and preparations for the new election should begin immediately.

Regarding the location of the District 4/6 line, it remains unclear whether redrawing the line is necessary and/ or feasible. Accordingly a hearing is ordered on this issue and set, for the present, for February 28, 2011 at 1:30 PM.

Plaintiffs' request that Mrs. Ned be reappointed to her seat is DENIED as extraordinary and unnecessary to vindicate the voters' rights at issue here. However, due to the special circumstances

and substantial injustice she has faced and consistent with Louisiana law, we ORDER that any length of residency requirements that would ordinarily render Mrs. Ned ineligible be waived, should the District line not be redrawn to include her residence, and should she choose to move into the District for the new election.

Finally, we wish to make it clear that a portion of the conversation at the February 28, 2011 hearing will address the correct apportionment rules to be applied to the special election referenced herein.

SIGNED on this _7_ day of February, 2011 at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE

18